# NO. 12-19-00027-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF I.W.,* | § | *APPEAL FROM THE 392ND* |
| | § | *JUDICIAL DISTRICT COURT* |
| *A CHILD* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

This appeal is from a judgment terminating R.S.'s and D.W.'s parental rights to I.W. R.S., D.W., and the attorney/guardian ad litem for I.W. appealed. We affirm.

## BACKGROUND

R.S. is the mother of I.W. and D.W. is the father of I.W.[1] On August 24, 2017, the Texas Department of Family and Protective Services (the Department) filed an original petition for protection of a child, for conservatorship, and for termination of R.S.'s and D.W.'s parental rights. The Department was appointed temporary managing conservator of I.W.

At the conclusion of a trial on the merits, the jury found, by clear and convincing evidence, that the parent-child relationship between I.W. and D.W. should be terminated and that the parent-child relationship between I.W. and R.S. should be terminated. Thus, the jury found, by clear and convincing evidence that D.W. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b)(1). The jury also found that termination of the parent-child relationship between D.W. and I.W. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between I.W. and D.W. be terminated.

---

[1] To protect the identity of the child who is the subject of this suit, we use initials to identify the various parties involved. *See* TEX. R. APP. P. 9.8(b)(2).

Further, the jury found, by clear and convincing evidence, that R.S. engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code Section 161.001(b)(1). The jury also found that termination of the parent-child relationship between R.S. and I.W. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between R.W. and I.W. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2018); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2018); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2018); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27–29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION UNDER SECTION 161.001(b)(1)

In his first issue, D.W. challenges the legal and factual sufficiency of the evidence to terminate his parental rights under Texas Family Code Section 161.001(b)(1)(D) and (E). In her first issue, R.S. argues the evidence is legally and factually insufficient to terminate her parental rights pursuant to Texas Family Code Section 161.001(b)(1)(D) and (E).

### Applicable Law

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West Supp. 2018). Subsection (D) addresses

the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra*, 869 S.W.2d at 577-78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded the risk. *In re N.R.*, 101, S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We have previously concluded it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id.*

The court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2018). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well-being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d at 811. It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Domestic violence may be considered evidence of endangerment. *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied). Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent engaged in a course of conduct which has the effect of endangering the child. *See, e.g.*, *In re C.R.*, 263 S.W.3d 368, 371 (Tex. App.—Dallas 2008, no pet.); *In re M.R.*, 243 S.W.3d 807, 818–19 (Tex.

5

App.—Fort Worth 2007, no pet.); *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The court may also order termination if the court finds, by clear and convincing evidence, that the parents failed to comply with the provisions of a court order that specifically establishes the actions necessary for them to obtain the return of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (West Supp. 2018). Subsection (O) does not quantify any particular number of provisions of the family service plan that a parent must not achieve in order for the parental rights to be terminated or the degree of a parent's conduct that will be deemed to be a failure to achieve a particular requirement of the plan. *See id.*; *In Interest of B.H.R.*, 535 S.W.3d 114, 122 (Tex. App.—Texarkana 2017, no pet.). Neither the statute nor the order which was entered prescribes the degree to which the parent must comply with the court order, and neither the order nor the statute "make[s] a provision for excuses" for the parent's failure to comply with such an order. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re J.S.,* 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (quoting *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied), *overruled on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, no pet.)).

## Evidence at Trial

Brittany Maness, a Department investigator assigned to the case, testified that she received an intake in August 2017. The intake stated concern that I.W.'s arms and legs were bruised, she may not be eating at home, and she had hair missing from her scalp. The allegations indicated possible physical abuse, neglectful supervision, and physical neglect. Maness learned that the family had a history with the Department. Two previous cases were ruled out and closed. The third involved allegations against D.W.'s spouse, J.F. In that case, I.W. was seen with bruising in December 2016. A safety plan was put in place; however, the allegations were ruled out after the family became uncooperative.

The evidence reflects that, at the time of the 2017 removal, I.W. was found with multiple bruises in various stages of healing. She also had marks around her wrists consistent with being bound and linear bruising to her back, which can be caused by an object such as a belt or extension cord. Sandra Onyinanya, a nurse practitioner who specializes in child abuse victims, clarified that the bruises to I.W.'s thighs were "more concerning for abusive injury because they're not typical of where children will bump into things and fall into things." Maness also testified that I.W.'s

bruises were atypical for a normal child and concerned her. I.W. has speech issues and was unable to say who or what caused her injuries. Janna Sherman, I.W.'s teacher, testified that she noticed "[l]ots of bruises" on I.W., along with marks around her wrists and ankles. Sherman observed that I.W. was "covered with little – little bruises all over like she had just been . . . maybe hit in different places all over her body. Just little bruises. And then the wrists and feet were – marks around where she might have been, I don't know, bound maybe."

D.W. testified that J.F. told him that I.W. fell through the porch, which caused her bruises. However, he also stated that he helped I.W. get dressed for school on the day of removal. He said that he only noticed the bruises to her knees. When asked about the bruises to her back, he said that he had no reason to look at her back so he would not have seen those bruises. He further testified that he did not know how I.W. received the majority of her bruises.

D.W. also stated that J.F. was I.W.'s primary caretaker due to his work schedule and the couple having one car. D.W. attempted to explain other possible causes of I.W.'s bruises. These theories included that I.W. is clumsy and would "stumble over herself," she fell playing at school, her pull-ups, capri pants, or socks caused the bruising, she had anemia, and she wore ponytail holders around her wrists. However, he admitted being unaware of how I.W.'s bruises occurred.

Onyinanya testified that she examined I.W. following I.W.'s removal by the Department. She testified that I.W.'s blood work indicated an elevated creatine kinase (CK) level, a normal platelet count, and a slightly low iron level. According to Onyinanya, an elevated CK level can be an indicator of physical trauma. She further stated that the normal platelets indicated that the bruising was caused by trauma and not a bleeding disorder. In addition, the iron level was not low enough to warrant an anemia diagnosis. When she last saw I.W., approximately one month before trial, I.W. had no bruises or abnormalities, which Onyinanya opined excluded any medical condition causing her bruising because the only change was to I.W.'s environment.

Karla Schacht, a Court-Appointed Special Advocate (CASA) volunteer, testified that her supervisor noted that I.W. was recovering from the bruising and moving very slowly at the first home visit. The supervisor also noted that I.W. appeared to be in a lot of pain. I.W. had a very limited vocabulary and appeared developmentally delayed. However, the supervisor was able to understand I.W. say "I hurt." In addition, I.W.'s limited vocabulary included a variety of profanity. Schacht testified that I.W. was very protective of her wrist and would not allow her wrist to be touched or have anything placed on it.

7

After removal, I.W. was taken to the dentist, where it was determined that she had six cavities. Her cavities were filled over the course of three appointments and two caps were placed on her teeth. I.W. also had significant ear wax build-up that required two visits to address.

At the time of removal, I.W. had a fungal infection over a large portion of her scalp and several patches of missing hair. Onyinanya testified that she was concerned that I.W.'s hair loss resulted from trauma or hair-pulling because of hair thinning, large scaly patches, and differing lengths of the hair in different areas. She testified that the scalp condition and fungal infection had "been there more than a week" due to its magnitude. I.W. was prescribed an oral fungal medication.

D.W. testified that I.W. had the head sores approximately one or two months before beginning school. He stated that he asked the doctor about the head sores when he took I.W. to get her school immunizations. He further claimed that I.W.'s bald spot was "pretty small" and "wasn't that bad." According to D.W., a nurse told him to put an antibiotic on I.W.'s scalp, keep it clean, and use shampoo to help strengthen and grow her hair. D.W. further claimed that I.W. would pull out her own hair when she had temper tantrums. He stated that I.W. pulls out her hair "when she gets mad." According to D.W., he called his grandmother when he and J.F. had difficulties with I.W.'s tantrums. She would "give them a break" and pick I.W. up for the weekend. While at her great-grandmother's home, I.W. was "pretty good" and "back to normal." D.W. further testified that I.W. had lice in her hair multiple times after visiting R.S.'s home and that the hair loss may be the result of the lice treatments.

Maness testified that she spent several hours with I.W. before she was placed in foster care. During that time, she did not observe I.W. pulling out her hair or otherwise intentionally harming herself. The CASA supervisor noted the "bare spot on the back of [I.W.'s] head." I.W.'s hair had been pulled out in so many different levels that the foster mother, a former hairstylist, "cut it in a bob." I.W.'s hair also appeared dyed.

Dr. Fernando Siles, a child psychiatrist, provided care for I.W. from October 2017 until April 2018. During that time, he diagnosed I.W. with disruptive mood dysregulation disorder (DMDD), which is diagnosed when a child has difficulties handling her emotions and controlling her behavior. He further diagnosed I.W. with uninhibited reactive attachment disorder (RAD), which has similar symptoms to autism. RAD is a condition that some children exhibit when there has been a change in caregivers and a child rebels because she does not feel comfortable in her environment. Dr. Siles explained that children with uninhibited RAD are "go-getters. They're

very forward. They have very poor boundaries. They don't know a stranger." Dr. Siles testified that he did not observe I.W. causing self-harm. He prescribed several medications to assist I.W. with her impulse control, attention span, and sleep. He testified that she improved during the four to five months of treatment. However, he believed that her improvement was a result of her new environment, regardless of the medication.

I.W. weighed twenty-eight pounds and was four years old at the time of removal. According to Onyinanya, I.W. was closer to the average size of a two-and-one-half year old and below the third percentile for children her age. She opined that I.W.'s weight was related to an environmental cause because she gained weight while on a normal diet once she was removed from D.W.'s home.

D.W. claimed that I.W. refused to eat, which caused her to be underweight. He told Maness that I.W. did not like to eat but that she liked fruits and vegetables. He brought fast food to the visitations because he wanted her to eat "something that's more fattening than fruit and stuff to get more meat on her bones." When asked what I.W. ate in a typical day, D.W. responded that he "tried hundred of different things everyday just to try to get her to eat something." He claimed that I.W.'s doctor told him that she had an eating disorder. According to D.W., the doctor told him to give I.W. PediaSure or Pedialyte to help her gain weight. However, "it would go straight through her," and the doctor told them to stop. D.W. claims the doctor's office gave him no further recommendations to help with I.W.'s weight.

D.W.'s grandmother testified that she only had difficulty getting I.W. to eat if she did not want that particular food. Maness stated that, on the day of removal, I.W. was very excited to eat and wanted to eat everything that was offered to her during their time together. I.W.'s therapist, Camella Jones, testified that I.W. "has had a hearty appetite." Schacht testified that she was surprised by I.W.'s eating habits because she would even eat chicken liver. She has never seen I.W. refuse food and initially had to make sure I.W. did not overeat. In addition, Sherman testified that I.W. was hungry at school and ate "with both fists" instead of a fork. She was fed breakfast and lunch every day at school.

I.W. was placed with and currently resides with R.S.'s aunt, T.T. When I.W. was placed with T.T., she was potty-trained, on medication, and weighed thirty-six pounds. According to T.T., I.W. eats what she is fed and only refuses to eat if she feels unwell. She has received no complaints from the school about I.W.'s eating and appetite.

9

T.T. testified that I.W. had night terrors for several months after moving in with her, but the night terrors have improved since October. She stated that I.W. still screams and has tantrums but does not cause self-harm. T.T. met with I.W.'s school, set up new psychologists and a psychiatrist, and got I.W. involved in speech therapy, occupational therapy, and equine therapy. T.T. stated that she can "[t]ell the difference from when [I.W.] started [equine therapy] and now." Schacht testified that I.W. is currently "flourishing . . . happy-go-lucky, doing very well, gaining a lot of weight" with T.T. Ryelea Etheredge, a Department caseworker, testified that I.W. is "doing very well" and her placement has been good for her.

**Termination of D.W.'s Rights**

The evidence reflects that at the time of the removal, I.W. was found with multiple bruises in various stages of healing. She had marks around her wrists that appeared to have been caused by being bound and linear bruises which could be from a belt, extension cord, or switch and are not made by accident. According to Onyinanya, the bruises to her thighs are "a lot more concerning for abusive injury because they're not typical of where children will bump into things and fall into things." Unfortunately, due to her speech delays, I.W. was unable to say who or what caused her injuries.

D.W. testified that he helped I.W. dress on the morning that the bruises were discovered and he only noticed the bruises on her knees. He claimed those bruises occurred when she fell through a porch. D.W. claimed he did not know I.W. had all of the bruises that were depicted in the photographs or that they were as serious as depicted. While D.W. provided some excuses and explanations for some of I.W.'s bruises, D.W. had no idea how I.W. received the majority of her bruises.

Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *Ziegler v. Tarrant Cty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). As sole judge of the weight and credibility of the evidence, when making its endangerment finding, the jury could have given very little weight to D.W.'s explanations for I.W.'s bruises and concluded that D.W. was put on notice in December 2016 that I.W. had unexplained bruises, yet he failed to take any action to protect I.W. *See M.R.J.M.*, 280 S.W.3d at 502 (inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings"

of the child's home under subsection (D)); *see also* **In re K.A.S.**, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied) (violent or abusive conduct by someone within household constitutes an environment that endangers children).

Moreover, I.W. had a severe fungal infection on her scalp and several patches of missing hair. D.W. claimed he spoke to the doctor about the scalp issues, but the medical records do not support his assertion. He also claimed that I.W. pulled out her own hair, which is unsupported by both the medical records and testimony from witnesses that I.W. does not cause self-harm. D.W. admitted knowing that I.W.'s scalp condition was as serious as depicted in the photograph taken at the emergency room and failing to treat I.W.'s scalp condition like he should have. While knowing that the child had this condition for at least two months, D.W. appears to have allowed J.F. to spray hair dye in the child's hair. D.W.'s failure to properly treat and care for I.W.'s scalp condition, standing alone, could lead a reasonable factfinder to determine that he endangered I.W.'s physical well-being. *See* **In re L.C.**, 145 S.W.3d 790, 796 (Tex. App.—Texarkana 2004, no pet.) ("endanger" includes jeopardizing a child's physical or emotional well-being).

The jury also heard evidence that I.W.'s weight fell below the growth chart and the third percentile for children her age. Although D.W. insisted that I.W. refused to eat, the jury heard testimony to the contrary. Sherman testified that I.W. ate "with both fists" at school and was not picky about her food. Maness fed I.W. and she was "very excited to eat anything" and "wanted everything" to eat. Onyinanya concluded that I.W.'s failure to eat was a result of her environment and not a medical cause. Additionally, the evidence demonstrated that D.W. and J.F. forced I.W. to stand in a corner with her hands above her head for long periods of time as punishment for not eating. D.W. acknowledged that it was "[p]robably not" appropriate to put the child in the corner when she would not eat.

A change in environment, as opposed to medication, resolved I.W.'s problems. As testified to by Dr. Siles, who treated I.W. for five months, I.W.'s pre-existing conditions were triggered by her many moves and caregivers, and her negative environment with D.W. and J.F. According to Jones, if the child's alleged behaviors in D.W.'s home abated once she entered the Department's care, it indicated that "there was some difficulty with her managing herself in that setting. There's some stressor that she's experiencing that's causing her to act out." She explained that it "could be a number of things that would trigger her" such as "smells or sounds or just movement." Based on the evidence presented, a reasonable factfinder could conclude that something was happening

in the home of D.W. and J.F. that was causing the child to refuse to eat, and to have extreme tantrums. *See Doyle v. Tex. Dep't of Prot. & Reg. Servs.,* 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied) (Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health).

The evidence presented to the jury detailed an on-going failure to meet or address I.W.'s therapeutic needs, scalp infection, weight issues, dental issues, and any developmental delays. *See P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) (lack of attention to medical needs is indicia which may prove endangerment); *see In re H.M.O.L.*, Nos. 01-17-00775-CV, 01-17-00776-CV, 2018 WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (parent's failure to provide appropriate medical care may constitute endangering conduct for purposes of subsection (E)) (citing *Smith v. Tex. Dep't of Fam. & Protective Servs.*, Nos. 01–09–00173–CV, 01–09–00390–CV, 2009 WL 4359267, at *8 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.) (mem. op.)); *Wyatt v. Dep't of Fam. & Protective Servs.*, 193 S.W.3d 61, 68 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (parent's pattern of medical neglect supported finding of endangerment of physical and emotional well-being); *see also In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) ("neglect can be just as dangerous to the well-being of a child as direct physical abuse"); *In re S.H.A.*, 728 S.W.2d 73, 88 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (failure to provide appropriate medical care endangering conduct even if parent did not cause condition that requires medical treatment). The overwhelming undisputed evidence, viewed in the light most favorable to the jury's findings, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that D.W. knowingly placed or knowingly allowed I.W. to remain in conditions or surroundings which endangered her physical or emotional well-being, and engaged in conduct or knowingly placed I.W. with persons who engaged in conduct that endangered the physical or emotional well-being of the child. *See In re J.F.C.*, 96 S.W.3d at 266; *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Because the evidence is legally and factually sufficient to support the jury's findings that D.W. violated subsections (D) and (E), we overrule D.W.'s first issue.

## Termination of R.S.'s Rights

R.S. argues that the evidence is insufficient to support termination of her parental rights under subsections (D) and (E). Specifically, she posits that the evidence is insufficient to show that she knowingly placed or allowed I.W. to be endangered. Because the jury also found that

R.S.'s parental rights should be terminated under subsection (O), the Department urges that R.S. waived this issue by failing to challenge subsection (O) on appeal. We disagree.

Generally, "to mount a successful challenge on appeal based on evidentiary insufficiency, a party must challenge each affirmative finding of a predicate ground for termination or at minimum challenge the best interest finding." *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.). However, the Texas Supreme Court recently held that allowing Section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court violates the parent's due process and due course of law rights. *Interest of N.G.*, No. 18-0508, 2019 WL 2147263, at *4 (Tex. May 17, 2019). In making its holding, the Court relied on subsection (M), which provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on the finding that the parent's conduct was in violation of Paragraph (D) or (E)." *Id.* at *2; TEX. FAM. CODE ANN. § 161.001(b)(1)(M). As a result, the "collateral consequences of terminating parental rights under Section 161.001(b)(1)(D) or (E) are significant." *N.G.*, 2019 WL 2147263, at *2. "When a parent has presented the issue on appeal, an appellate court that denies review of a [S]ection 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.*, at *3. Therefore, due process and due course of law requirements mandate that an appellate court detail its analysis in an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the Family Code if a parent raises such issues. *Id.* at *4. Accordingly, in light of the Supreme Court's decision in *N.G.*, we will consider R.S.'s sufficiency argument as to subsections (D) and (E), even though she does not challenge termination under subsection (O).

The evidence at trial demonstrated that R.S. had not seen I.W. for at least eight months prior to I.W.'s removal from D.W.'s home. D.W. claimed R.S. failed to visit I.W. and R.S. contended that D.W. withheld visits from her. The evidence showed that I.W. was placed with D.W. via court order. R.S. was convicted of theft in 2014 and served six months in jail. After R.S. was released from jail, she claimed D.W. "wouldn't give [I.W.] back." D.W. claimed R.S. gave him possession of I.W. due to a lack of stable home and employment. D.W. was granted custody through the Attorney General's office. R.S. received visitation under the order. R.S. stated that D.W. "made up an excuse for him not to bring her to me or not let me have her." D.W.

testified that the "majority of the time [R.S.] wouldn't even show up for her visits." The Department intervened in August 2017, and R.S. last saw I.W. in October 2016.

While the evidence, as discussed above, was sufficient to show that D.W. knowingly placed or knowingly allowed I.W. to remain in conditions or surroundings which endangered her physical or emotional well-being and engaged in conduct or knowingly placed I.W. with persons who engaged in conduct that endangered the physical or emotional well-being of the child, the record contains no evidence showing that R.S. was aware of that conduct or that she knowingly allowed I.W. to remain in those conditions. *See In Interest of A.L.H.*, 468 S.W.3d 738, 746-47 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (Department did not introduce sufficient evidence that father had knowledge of child's environment). R.S. did not place I.W. with D.W., and her confinement, standing alone, cannot support termination. *See In re S.Z.G.*, No. 12-02-00081-CV, 2003 WL 21771759, *6 (Tex. App.—Tyler July 31, 2003, pet. denied) (mem. op.). Nor does the record suggest that R.S. was aware of any potential for danger to the child. *See In re C.L.C.,* 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) ("It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk"). Absent proof that R.S. placed or allowed I.W. to remain in an endangering environment or with persons who engaged in endangering conduct, a reasonable trier of fact could not have formed a firm belief or conviction that R.S. knowingly placed or knowingly allowed I.W. to remain in conditions or surroundings which endangered her physical or emotional well-being, or engaged in conduct or knowingly placed I.W. with persons who engaged in conduct that endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). As a result, we conclude the evidence is legally insufficient to support termination of R.S.'s parental rights under subsections (D) and (E).

Nevertheless, R.S.'s parental rights were also terminated under subsection (O), which provides that the court may order termination if the court finds, by clear and convincing evidence, that the parent failed to comply with the provisions of a court order that specifically establishes the actions necessary for the parent to obtain the return of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(O). In this case, the service plan required, in pertinent part, that R.S. submit to random drug tests, complete a psychological evaluation and follow recommendations, and obtain employment.

14

Etheridge testified that R.S. failed to submit to drug testing five different times, attend counseling sessions as recommended, or obtain employment. She testified that R.S. is noncompliant with her service plan. R.S. admitted failing to comply with the court-ordered service plan. For instance, R.S. testified that she failed to appear for drug screenings on five occasions. She admitted knowing that the failure to appear for a drug test would be considered a positive test. R.S. also failed to attend the required counseling. Two different therapists unsuccessfully attempted to contact R.S. Although R.S. completed a drug assessment, it was recommended that she attend substance abuse counseling and narcotics anonymous. However, she never attended either. In addition, R.S. failed to obtain and maintain employment. Given this evidence, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that R.S. failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of I.W. *See **In re J.F.C.***, 96 S.W.3d at 266. As a result, the evidence is legally and factually sufficient to support the jury's finding that R.S. failed to comply with her court-ordered service plan in violation of subsection (O). We overrule R.S.'s first issue.

## BEST INTEREST OF THE CHILD

In her second issue, R.S. challenges the legal and factual sufficiency of the evidence to support a finding that termination of her parental rights is in the child's best interest. D.W.'s second issue and I.W.'s brief argue the evidence is legally and factually insufficient to support a finding that terminating D.W.'s parental rights is in I.W.'s best interest. In determining the best interest of the child, we consider a number of factors, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The family code also provides a list of factors that we consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016). Those statutory factors include (1) the child's age and physical and mental vulnerabilities; (2) the

15

magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id*. § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.–Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *M.R.J.M.*, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. *Id*. Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28–29. We apply the statutory and *Holley* factors below.

**Analysis**

The evidence discussed above shows that, at the time of removal, I.W. suffered from bruises, hair loss, a scalp infection, speech delays, and a weight issue. The evidence further shows that I.W.'s issues were a result of her environment with D.W. and J.F.

The evidence presented at trial shows that at D.W.'s first visit with I.W., I.W. "appeared to be kind of scared of him." And while there was initially a lot of affection between R.S. and I.W. during visits, it quickly faded. Evidence also showed that I.W.'s behavior worsened following visits with her parents. Her profanity and night terrors increased for a few days afterwards. Breanna Ellege, a Department human services technician, testified that while I.W.

16

"thought it was fun to come and play around for an hour," she was not sad to leave her parents and did not cry at the end of visits.

The evidence showed that I.W. will continue to need speech therapy and occupational therapy. T.T. testified that she has ensured that I.W. received all necessary care and treatment since the placement. Conversely, the jury heard testimony that D.W. discontinued I.W.'s play therapy in the past because the therapist attempted to address the home environment. And when D.W. was told the therapist was willing to see I.W. again, D.W. did not attempt to reinstate the therapy. Nor did D.W. seek speech therapy for I.W.

While D.W. opined that I.W. is easier to manage because of her current medication, Jones testified that several environmental changes were required before medication would work. Specifically, I.W. needed basic nutrition, a sense of safety, and parents with the understanding to implement recommendations by the various doctors and therapists. And, again, Dr. Siles believed that I.W.'s improvement was a result of her new environment.

The evidence also shows that R.S. had nothing prepared for I.W. to return home. And, as previously discussed, she failed to comply with several aspects of her service plan. R.S. was also unaware that I.W. attended occupational therapy. She did not know how she would ensure that I.W. continued her various therapies. In addition, R.S. is unemployed and dependent on her boyfriend's mother. R.S. testified that it is in I.W.'s best interest to have a "loving, sweet home to live in." She further testified that I.W. seemed happy living with T.T. and that T.T.'s home is a nice place for I.W.

Schacht testified that terminating R.S.'s and D.W.'s rights is in I.W.'s best interest. She stated:

> [I.W.] was hurt when she came into care. Grossly neglected. I don't know who did it, but I know that she was in that home and was not protected. A child deserves to be protective -- protected and all their needs fulfilled. That includes weight. That includes your ear wax. That includes your head. That includes the bruises.

She further testified that I.W. made significant changes while in T.T.'s care and that "she is in the place she needs to be." Etheredge testified that I.W. would have normalcy if the parental rights were terminated and T.T. was allowed to adopt her. Jones testified that I.W. needs stability and permanence and that I.W.'s need for security is met in T.T.'s home. The jury also heard evidence

that I.W. is flourishing with T.T. and that the change in environment is responsible for her improvement.

Viewing the evidence above relating to the statutory and *Holley* factors in the light most favorable to the trial court's findings, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of D.W.'s and R.S.'s parental rights is in the best interest of the child. *See In re J.F.C.*, 96 S.W.3d at 266. Because the evidence is legally and factually sufficient to support the trial court's finding that termination of D.W.'s and R.S.'s parental rights is in the child's best interest, we overrule R.S.'s second issue, D.W.'s second issue, and I.W.'s first and second issues. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

## DISPOSITION

Having overruled R.S.'s first and second issues, D.W.'s first and second issues, and I.W.'s first and second issues, we *affirm* the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered June 28, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

18



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JUNE 28, 2019

## NO. 12-19-00027-CV

## IN THE INTEREST OF I.W., A CHILD

Appeal from the 392nd District Court
of Henderson County, Texas (Tr.Ct.No. FAM17-0650-392)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*